IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 05-cv-01346-PSF-MEH

FARMERS ALLIANCE MUTUAL INSURANCE COMPANY,

   Plaintiff,

v.

CHRIS J. CUTRONE,

   Defendant.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Dkt. # 13) filed on January 27, 2006, and Defendant's Cross-Motion for Summary Judgment (Dkt. # 21), filed February 24, 2006. Both motions are fully briefed and ready for disposition.

### I. BACKGROUND

On May 8, 2003, as part of his employment as a Technician[1] with the Colorado State Patrol, Defendant Chris Cutrone ("Trooper Cutrone") was patrolling a highway south of Cortez, Colorado. Compl. (Dkt. # 1) ¶ 9; Ans. (Dkt. # 7) ¶ 13. Another State Patrol Trooper called Trooper Cutrone to inform him that there was a person who "looked suspicious" in a vehicle coming toward Trooper Cutrone and that he should watch for that vehicle. Compl. ¶ 10; Ans. ¶ 14. Trooper Cutrone observed the vehicle

---

[1] According to defendant, Technician is "the same as trooper." Cutrone Sworn Statement, Ex. 2 to Pl.'s Br. Supp. S.J. at 4; see also Def.'s Br. Supp. Resp. at 2 (referring to "Trooper Cutrone").

and stopped it for "following too closely." Cutrone Sworn Statement, Ex. 2 to Pl.'s Br. Supp. S.J. (Dkt. # 13) at 4. The driver was later identified as Brent David Derrick and the vehicle was a Buick LeSabre. Pl's Br. Supp. S.J. at 3. Derrick pulled the Buick off the highway onto the shoulder and stopped immediately after Trooper Cutrone turned on his patrol car lights. Cutrone Sworn Statement at 9.

Trooper Cutrone stopped his patrol car approximately 18 to 20 feet behind the Buick. Compl. ¶ 15; Ans. ¶ 19. Approximately 20 seconds passed from the time Derrick brought the Buick to a stop to the time when Trooper Cutrone exited his patrol vehicle to contact the driver. Cutrone Sworn Statement at 11. In accordance with his State Patrol training, Trooper Cutrone approached the Buick by touching the trunk, proceeding past the back door to the post between the back passenger door and the driver's door, which is referred to as the "B" post. Compl. ¶¶ 19-20; Ans. ¶¶ 23-24. The procedure of greeting the car at the "B" post allows officers to watch the driver's hands. Compl. ¶¶ 19; Ans. ¶ 23.

Following procedure, Trooper Cutrone leaned forward from the "B" post to greet the driver. Comp. ¶¶ 28-29; Ans. ¶¶ 32-33. As Trooper Cutrone was leaning forward from the "B" post, Derrick turned to his left, looked at Trooper Cutrone, raised a .45 caliber pistol, and shot Trooper Cutrone three times through the open driver's side window. Compl. ¶ 29; Cutrone Sworn Statement at 12-14.

At the time of the incident, Trooper Cutrone had a Personal Auto Policy ("Policy") issued by Plaintiff Farmers Alliance Mutual Insurance Company ("Farmers") numbered PV 113541, with coverage from January 14, 2003 to January 14, 2004.

Compl. ¶ 38; Ans. ¶ 42.  The policy provides uninsured motorist ("UM") coverage, subject to certain terms and conditions, with a limit of liability of $100,000.  Compl. ¶ 40; Ans. ¶ 44.  The policy contains the following language:

> We will pay compensatory damages which an "insured" is legally entitled to recover from the owner or operator of an "uninsured motor vehicle" because of "bodily injury": (1) Sustained by an "insured"; and (2) Caused by an *accident*.  The owner's or operator's liability for these damages must arise out of the *ownership, maintenance or use* of the "uninsured motor vehicle".

Ex. 1 attached to Pl.'s Br.Supp. at 5 (emphasis added).  Trooper Cutrone made a claim with Farmers under the Policy for UM benefits in the amount of $100,000 for injuries sustained in the May 8, 2003 shooting.  Compl. ¶ 41; Ans. ¶ 45.

Trooper Cutrone asserts that it can establish the fact that the Buick was uninsured at the time of the shooting.  Def.'s Reply Supp. S.J. Cross-Motion (Dkt. # 29) at 9.  Derrick assaulted Betty Reid in Texas on April 30, 2003 and stole Ms. Reid's Buick LeSabre.  Ex. A attached to Def.'s Reply at 9.  Ms. Reid had her own insurance policy issued by Republic Insurance Company.  Ex. B attached to Def.'s Reply.  Because Derrick was not an authorized driver on Ms. Reid's policy and because the record indicates no independent policy issued to Derrick, Trooper Cutrone contends that accidents involving Derrick's use of the Buick would activate a policy holder's UM coverage.  Def.'s Reply at 10.

On July 19, 2005, Farmers filed a Complaint for Declaratory Judgment seeking an order declaring that Trooper Cutrone is not entitled to recover for UM coverage.  Trooper Cutrone's Answer (Dkt. # 7) presented several defenses and counterclaims for

breach of contract, bad faith breach of insurance contract, and deceptive trade practices. The Complaint asserts jurisdiction under 28 U.S.C. § 1332, diversity of citizenship. Compl. at ¶ 3. Both parties in their motions for summary judgment seek a declaration as to whether UM coverage is available in this situation, and both agree that the claim for declaratory relief presents solely a legal issue and is thus appropriate for summary judgment. Def.'s Cross-Mot. S.J. (Dkt. # 21) at 1; Pl.'s Br.Supp. S.J. at 1.

## II. APPLICABLE LEGAL STANDARDS

Summary judgment is appropriate under F.R.Civ.P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). When applying this standard, a court reviews the pleadings and the documentary evidence in the light most favorable to the nonmoving party. *See Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988). To defeat a properly supported motion for summary judgment, "there must be evidence on which the jury could reasonably find for the" nonmoving party. *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In addition, "'where the non moving party will bear the burden of proof at trial on a dispositive issue' that party must 'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's

case' in order to survive summary judgment." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 322).

When parties file cross-motions for summary judgment and there is no nonmoving party, the Court may assume that it need not consider any evidence other than materials filed by the parties. *James Barlow Family Ltd. Partnership v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997), *cert. denied*, 523 U.S. 1048 (1998) (citations omitted). If the materials submitted give rise to a genuine issue of material fact, summary judgment is inappropriate. *Id.* The standard for summary judgment presented by F.R.Civ.P. 56 is applicable for cases seeking declaratory judgment. *United States v. Gammache*, 713 F.2d 588, 594 (10th Cir. 1983).

As a district court sitting in diversity, this Court must apply the substantive law of Colorado, the forum state. *See e.g. Salve Regina College v. Russell*, 499 U.S. 225, 226 (1991). In Colorado, the construction of an insurance contract is a question of law governed by the general law of contracts. *F.D.I.C. v. American Cas. Co. of Reading, Pa.*, 843 P.2d 1285, 1289-90 (Colo. 1992). If the terms of the policy are ambiguous, a court should construe the policy against the insurer and in favor of coverage. *Nicholls v. Zurich Am. Ins. Group*, 244 F. Supp. 2d 1144, 1156 (D. Colo. 2003) (applying Colorado law). If, however, an insurance policy is unambiguous, a court will enforce it in accord with its plain language. *Id.*

Colorado law recognizes two provisos to the rule that an insurance policy is to be interpreted according to the settled principles of contract law. First, a court must take into account "a common-law duty 'not to unreasonably withhold payment of

benefits,'" because the contract creates a "quasi-fiduciary" duty. *State Farm Mut. Auto. Ins. Co. v. Kastner*, 77 P.3d 1256, 1259-60 (Colo. 2003) (quoting *Farmer's Group, Inc. v. Williams*, 805 P.3d 419, 423 (Colo. 1991)). Second, the contract must comply with statutory requirements of UM coverage. *Id.* at 1260. The UM statute requires insurers to provide coverage against uninsured motorists for injuries for "arising out of . . . use" of an automobile unless the insured rejects such coverage in writing. C.R.S. § 10-4-609(1)(a). Courts have interpreted the legislative intent of this statute to "provide compensation for injury caused by an uninsured motorist equal to that obtainable for injury caused by an insured motorist." *State Farm Mut. Auto. Ins. Co. v. Nissen*, 851 P.2d 165, 168 (Colo. 1993) (citations omitted).

### III.  ANALYSIS

Farmers seeks a declaratory determination that the UM policy in question does not cover defendant's injuries. Pl.'s Mot. S.J. at 1.

#### A. Is the Underlying Incident an "Accident" Under the Policy?

A preliminary question is whether Trooper Cutrone was the victim of an "accident" under the terms of the policy, notwithstanding the intentional injury he suffered at the hands of a gunman. The Court assumes that he was. Where the term "accident" is undefined in an insurance policy, as here, whether an injury resulted from an accident for uninsured motorist coverage purposes is determined from the standpoint of the insured. *State Farm Mut. Auto Ins. Co. v. McMillan*, 925. P.2d 785, 793 (Colo. 1996). While police duty is inherently dangerous, including the patroling of highways, the facts leading up to the stop of Derrick, even though he "looked

suspicious," would not have lead a reasonable person in Trooper Cutrone's position to contemplate a particular or high degree of danger. Thus, from defendant's perspective as the insured, he was the victim of an "accident" under the policy.

### B. Was a Motor Vehicle "Used" in Connection with the Injury for Uninsured Motorist Coverage?

Moving to the policy language that is the crux of this dispute, the parties agree that the claim in dispute could not arise out of the "ownership" or "maintenance" of a car and, therefore, the relevant inquiry must focus on whether the Buick was being "use[d]" in a manner that would bring it within the scope of the policy. *Id.* at 4; Def.'s Resp. at 5. In *Kastner*, a narrow Colorado Supreme Court majority articulated a two-part test for determining whether UM coverage exists pursuant to policy statements basing coverage on incidents "arising out of the use of a motor vehicle." 77 P.3d at 1261 (citing Colorado's UM statute, C.R.S. § 10-4-609(1)(a)). First, the Court must determine if the uninsured vehicle's "use is foreseeably identifiable with the inherent purpose of a motor vehicle." *Id.* at 1263. The second prong of the inquiry is determining "whether the 'use' is causally related to the claimant's injury." *Id.* at 1263.

#### 1. Determination of "Use"

To determine "use" of the Buick within the scope of the UM policy, the Court must inquire into "the factual circumstances in each case," including "the particular characteristics of the vehicle and the intention of parties to the insurance contract." *Aetna Cas. & Sur. Co. v. McMichael*, 906 P.2d 92, 102 (Colo. 1995). The "use" cannot be "foreign" to the vehicle's "inherent purpose." *Cung La v. State Farm Auto. Ins. Co.*,

830 P.2d 1007, 1011 (Colo. 1992). Though "use" may be "broad enough to cover activities beyond mere 'transportation,'" when analyzing noncommercial passenger vehicles with no apparent special purpose, a court may infer that such a vehicle has "no obvious inherent use apart from its purpose as a mode of transportation." *Kastner*, 77 P.3d at 1262. Here, the vehicle characteristics for the case at bar are not in dispute as Trooper Cutrone concedes the Buick is a passenger vehicle whose inherent purpose is transportation. Def.'s Resp. at 7.

In *Kastner*, the Colorado Supreme Court held that a passenger car was not being used in a reasonably foreseeable manner when it was used as part of a kidnapping and sexual assault. 77 P.3d at 1265. In denying UM coverage in *Kastner*, the Colorado Supreme Court overruled a court of appeals determination that the use of the reclining passenger seat as a means of hiding the victim, the use of the car as an isolated location, and the use of seat belts as restraints were uses within the scope of the UM coverage. It found that none of these uses related to the car's transportation "use" as contemplated at the time of the insurance contract. *Id.* at 1265-66.

In *Cung La*, an assailant shot a policy holder as both were proceeding down the highway in separate cars. 830 P.2d at 1008. The court found that the "no fault"[2] and UM provision of the policy covered the disputed "use," because neither the insured driver nor the uninsured motorist was using their vehicle in a manner "foreign" to the vehicle's "inherent purpose." *Id.* at 1012. Relevant to the court's inquiry was the fact

---

[2]The analysis of uninsured/underinsured coverage for "use" is identical to its analysis of no fault coverage for "use." *See e.g. Kastner*, 77 P.3d at 1260.

that the vehicles involved "were proceeding on I-70" and that the shooter identified the insured by the appearance of his car and used two other cars to help isolate the victim's vehicle on the highway. *Id.* at 1011.

Finally, in *Mason v. Celina Mut. Ins. Co.*, 161 Colo. 442, 423 P.2d 24 (Colo. 1967), a high school student accidently shot another student in an insured's car while the insured had returned to class. The court found that the insurance contract did not cover the accidental death in part because "[t]he vehicle was parked at the time, the engine was not in operation and no part of [the shooter's] body struck the vehicle to occasion the discharge of the firearm." 161 Colo. at 443, 423 P.2d at 24.

In the instant case, Farmers claims that no coverage exists because the Buick's only covered use is a transportation use and the vehicle was not engaged in such a use because, as in *Kastner*, the car was stopped at the time of the shooting. Pl.'s Br. Supp. S.J. at 6-7. Farmers further asserts that the Buick was merely "the site from which" Derrick shot defendant and that such a use is not foreseeably identifiable with the inherent transportation purpose of the car. *Id.* at 10. Distinguishing this case from *Cung La*, Farmers points out that Derrick was not proceeding down a highway at the time of the shooting. *Id.* at 8. Further, Farmer asserts that because no coverage existed in *Kastner*, where a criminal completed an assault *within* a stopped car, no coverage exists here, where a criminal injured Trooper Cutrone *outside* of the car. *Id.* at 10.

Trooper Cutrone, on the other hand, argues for a "liberal interpretation" of "use," claiming that because the Colorado Supreme Court does not view a traffic stop as a

9

"significant interruption" within the scope of a Fourth Amendment analysis, such stops should not be viewed as significant interruptions in the transportation use analysis.  *Id.* at 8.  Further, according to Trooper Cutrone, Farmers knew or should have known that traffic stops are a common occurrence and that Trooper Cutrone was a State Trooper.  Def.'s Resp. at 10.

Under the controlling case law, it is possible for an automobile to be "proceeding down the highway" in a manner contemplated by the "use" provision of an insurance contract without necessarily engaging in its locomotive function.  In other words, the Buick in the instant case was not moving, but was being operated in a transportation function by Derrick.  *See Kastner*, 77 P.3d at 1263 (discussing use of the ordinary passenger car as "transportation").  In fact, because compliance with Colorado State Patrol officers is a statutory requirement, *see e.g.* C.R.S. § 42-4-107 ("[n]o person shall willfully fail or refuse to comply with any lawful order or direction of any police officer"), it is fair to assume that such use is contemplated by the insurance contract.  *See e.g. Spencer v. Liberty Mut. Ins. Corp.*, 381 F. Supp. 2d 811, 819 (S.D. Ind. 2005) ("Compliance with statutory duties imposed on the driver of a motor vehicle as a condition on using the vehicle on public roads is, as a matter of law, conduct essential to the driver's use of that vehicle.").

There are two important distinctions between this case and the facts in *Kastner*, where no covered use was found.  First, in *Kastner*, the assailant began the assault outside of the car and ordered the victim to enter the vehicle after holding her at knife-point.  Thus the operative misconduct in question began before the car was engaged.

*Kastner*, 77 P.3d at 1258-59. In contrast, Derrick assaulted Trooper Cutrone from inside the car while sitting in the driver's seat after being pulled over by Trooper Cutrone. Second, the sexual assault in *Kastner* took place off the road and in a park as opposed to the highway shoulder in the course of an authorized stop. *See id.* at 1259.

Further, the *Kastner* court based its holding on the grounds that using a vehicle and its furnishings for the purposes of a sexual assault was not a "reasonably foreseeable" use, *id.* at 1258, yet it did not overturn the ruling in *Cung La* that recovery under an auto insurance policy for injuries resulting from a gunshot from an assailant in an automobile was allowable. Also, plaintiff's attempt to analogize the car parked in the high school parking lot in *Mason* with the pulled-over car in this case is strained by the important distinction that the insured individual was remote to the accident in *Mason* whereas Trooper Cutrone, who pulled the attacker's vehicle over to the highway shoulder, was the victim of the incident at issue. *See* Pl.'s Reply at 7; *Mason*, 161 Colo. at 443, 423 P.2d at 24.

Thus, the Court finds that the car operated by Derrick was engaged in a transportation use at the time of the shooting. Such a conclusion is also supported by the intent of the UM provision, which is to provide coverage equal to what would exist for an injury caused by an insured driver, *Nissen*, 851 P.2d at 168, and the rule that policy language ambiguities should be resolved in favor of the insured. *Nicholls*, 244 F. Supp. 2d at 1156. Here, although the Buick was not in locomotion at the time of the shooting, it was "proceeding down a highway" in a manner foreseeable as of the time of the "accident" consistent with the car's transportation purpose. *See Kastner*, 77 P.3d at

11

1263. The car had pulled over pursuant to a statutory condition of highway use. Insurance companies presumably both contemplate and rely upon drivers' compliance with statutory requirements. As such, the possibility that Trooper Cutrone may have been in an "accident" with a stationary, pulled-over vehicle is reasonably foreseeable and thus contemplated under the policy. Because the car was being used in a manner consistent with it's "inherent purpose" of transportation, the Court finds that it was engaged in "use" as contemplated by the UM provision of the policy.

### 2. Causal Nexus

Once a court finds that a vehicle was engaged in a covered "use," it must turn to the question of whether there is a sufficient causal nexus between use and injury. *Kastner*, 77 P.3d at 1264-66. To fulfill his causal burden, an insurance claimant must demonstrate that "the 'use' of the vehicle and the injury are directly related or inextricably linked so that no independent significant act or non-use of the vehicle interrupted the 'but-for' causal chain between the covered use of the vehicle and the injury." *Id.* at 1264

In *Cung La*, the Colorado Supreme Court found that because the assailant "would not have shot [the claimant] but for his driving the vehicle," the injuries were causally connected to the car's use. 830 P.2d at 1012. In reaching this determination, the court observed that "[t]he assailant's use of a firearm to shoot the petitioner does not preclude the petitioner's resulting injuries from having arisen out of the use of the uninsured motor vehicle if that vehicle contributed to the injuries and the injuries would

not have been sustained but for the assailant's use of the uninsured vehicle." *Id.* at 1009.

Without overruling *Cung La*, the Colorado Supreme Court added to the requirement of a "but for" connection by requiring that an "unbroken causal chain" exist between vehicle use and injury. *Kastner*, 77 P.3d at 1264. Thus, the standard for causation is higher than "but for," though not as strict as "proximate cause in the tort sense." *Id.* at 1263. When the underlying accident is "intentional, even criminal," the claimant bears the burden of demonstrating that the injury arose out of a use of the vehicle and the resulting injury constitute "one ongoing assault," and "the 'use' of the vehicle must bear a direct relation to the assault." *Id.* at 1264-65.

Farmers argues that the temporal shift between the stop and shooting breaks the causal chain and that the intentionality of the shooting further distances the car's use from the accident. Pl.'s Br.Supp. S.J. at 11, 13. Trooper Cutrone, however, claims that his injury "flows directly from the 'use' of the vehicle, without interruption," and thus the necessary causal relationship exists between use and injury. Def.'s Resp. at 12-13 (quoting *Kastner*, 77 P.3d at 1265). The parties do not dispute that Derrick's actions as a shooter were intentional.

Even assuming that the approximately 20-second pause between the stop and the assault does not interrupt the transportation use, the Court finds that Trooper Cutrone cannot demonstrate the requisite inextricable link between the use and the injury because there was an interrupting "independent significant act or non-use of the vehicle." *Kastner*, 77 P.3d 1264. Trooper Cutrone collapses the analysis of the "but-

for" causation with the "unbroken causal chain" analysis by simply stating that the car would not have been pulled over but for the assailant's manner of transportation use. Def.'s Resp. at 15.  Unlike *Cung La*, however, where the assailant used the car as an "active accessory" to maneuver into a position to shoot the claimant, the record here does not indicate that Derrick used or maneuvered the car to facilitate his shooting Trooper Cutrone.  *Id.*  The shooting may not have taken place "but for" Derrick's use of the Buick under the *Cung La* analysis; however, defendant fails to establish the stopped car as an accessory to the shooting so as to overcome the "independent significant act" requirement presented by *Kastner*.  77 P.3d at 1264.

Therefore, the Court finds an insufficient causal nexus between the automobile's transportation "use" and the "accident."  As such, the UM provision of the policy does not provide coverage for Trooper Cutrone's unfortunate injuries.  Plaintiff's motion for summary judgment as to coverage is therefore granted, and defendant's motion for summary judgment as to coverage is denied.

### C.  Defendant's Counterclaims

Trooper Cutrone filed counterclaims for breach of contract, bad faith breach of insurance contract, and deceptive trade practices in contravention of the Colorado Consumer Protection Act ("CCPA").  As to the first counterclaim, breach of contract, plaintiff moves for summary judgment.  Pl.'s Br. Supp. S.J. at 14-15.  Defendant requests that the Court refuse plaintiff's application for summary judgment on all counterclaims so that defendant can pursue additional discovery on issues of bad faith and the CCPA pursuant to F.R.Civ.P. 56(f).  Def.'s Resp. at 16.

To establish a counterclaim for breach of contract, a party must establish (1) the existence of a contract, (2) performance by the claimant, (3) failure to perform by another contracting party, and (4) resulting damages. *W. Distrib. Co. v. Diodosi*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted) (articulating longstanding support for Colorado breach of contract standard); *see also Vaughn v. Rhea*, 2006 WL 1549760 at *13 (D. Colo., May 30, 2006). Here, a contract exists, but does not cover the injury presented. Because no contractual obligation exists as asserted, there can be no claim for breach of contract based on defendant's factual contentions. No additional discovery would aid plaintiff in surviving summary judgment on this claim. Plaintiff's request for summary judgment on the counterclaim for breach of contract is therefore granted.

Plaintiff also seeks summary judgment on defendant's bad faith breach of an insurance contract counterclaim. Pl.'s Br.Supp. at 15. Summary judgment in favor of an insurance company is appropriate for bad faith breach of insurance contract claims when a court determines that the insurance contract does not provide coverage for the underlying facts. *See Tynan's Nissan, Inc. v. American Hardware Mut. Ins. Co.*, 917 P.2d 321, 326 (Colo. App. 1995) (citing *Jarnagin v. Banker's Life and Cas. Co.*, 824 P.2d 11 (Colo. App. 1991)). Because the Court has determined that there is no underlying insurance coverage in the case at bar, it also grants summary judgment in favor of plaintiff for the bad faith breach of insurance contract counterclaim.

Lastly, plaintiff seeks summary judgment with respect to defendant's counterclaim for violation of the CCPA. Pl.'s Br.Supp. at 24-29. Defendant requests a

continuance to allow for additional discovery, including depositions, to substantiate the alleged CCPA violations with an analysis of why plaintiff wrongfully denied defendant coverage. Def.'s Resp. at 15-16.

To present a viable claim against a party for violating the CCPA, a claimant must demonstrate (1) that the party "engaged in an unfair trade practice," (2) in the course of its "business, vocation or occupation," (3) that the practice "significantly impacts the public as actual or potential consumers," (4) the claimant suffered injury to a "protected legal interest," and (5) the act caused the claimant's injury. *Anderson v. State Farm Mut. Auto. Ins. Co.*, 416 F.3d 1143, 1148 (10th Cir. 2005) (quoting *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003)). A deceptive trade practice may include "knowingly making 'a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, foods, services, or properties'" as well as "failing to 'disclose material information concerning . . . services . . . if such failure to disclose such information was intended to induce the consumer to enter into a transaction.'" *Anderson*, 416 F.3d at 1148-49 (quoting C.R.S. §§ 6-1-105(e), 6-1-105(u)).

Though defendant asserts that he has "not yet obtained sufficient discovery" on the counterclaim, Def.'s Resp. at 16, he does not specify what additional information would inform his claim or demonstrate that he served or requested any discovery. Presumably, most information or evidence regarding what representations defendant received would be in defendant's possession already. Defendant has failed to present an affidavit "explaining why he or she cannot present facts to oppose the motion" for

summary judgment.  *Dreiling v. Peugeot Motors of America, Inc.*, 850 F.2d 1373, 1376 (10th Cir. 1988); *see also* F.R.Civ.P. 56(f).  Accordingly, this Court grants summary judgment for plaintiff on defendant's counterclaim for violation of the CCPA.  *See Dreiling*, 850 F.2d at 1376-77 (not an abuse of discretion to grant summary judgment when a party fails to file an affidavit pursuant to F.R.Civ.P. 56(f), citing *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 832-33 (10th Cir. 1986)).

## IV.  CONCLUSION

For the foregoing reasons, plaintiff's Motion for Summary Judgment (Dkt. # 13) is GRANTED.  Defendant's Cross-Motion for Summary Judgment (Dkt. # 21) is DENIED.  This case is dismissed in its entirety.

DATED: August 31, 2006

BY THE COURT:

*s/ Phillip S. Figa*
_____
Phillip S. Figa
United States District Judge